Nellie .Atkins ARMSTRONG, Plaintiff,

v.

MAPLE LEAF APARTMENTS, LTD., a limited partnership, Broken Arrow's Mall, Inc., a corporation, Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, Firstul Mortgage Company, a corporation, Sackman-Gilliand Corporation, a corporation, First National Bank & Trust Company of Tulsa, Oklahoma, a Banking Association, Hamilton Investment Trust, a Massachusetts Business Trust, and, H. Harold Becko, Defendants.

No. 74–C–119.

United States District Court,
N. D. Oklahoma.

Aug. 2, 1977.

---

Jay C. Baker, C. Rabon Martin, Baker, Baker & Martin, Tulsa, Okl., for Nellie Atkins Armstrong, plaintiff.

William Jones and Philip J. Eller, Jones, Givens, Brett, Gotcher, Doyle & Bogan, Inc., Tulsa, Okl., William H. Mattoon, Norman, Okl., James D. Groves, James R. Ryan, James L. Kincaid, Douglas L. Inhofe, Royce H. Savage, Dan A. Rogers and Charles A. Whitebook, Tulsa, Okl., for Maple Leaf Apartments et al., defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARROW, Chief Judge.

On February 22, 1974, the plaintiff instituted the subject action in this Court seeking to quiet title to real property situated in Tulsa County, Oklahoma, to cancel a deed thereto given by her under date of December 3, 1965, to cancel all instruments of conveyance and encumbrance executed and recorded since her deed of December 3, 1965, and for ejectment of the defendants in possession of the subject real property. The plaintiff predicated her right to the relief sought upon the Act of Congress of August 4, 1947, 61 Stat. 731, wherein a conveyance by a member of the Five Civilized Tribes of one-half (½) blood or more covering real property inherited or devised to such member by one in whose hands such real property was restricted against alienation is required to be approved by the County Court of the County in which the real property is situated as a condition precedent to the validity of such conveyance. Subsequent to the filing of this action and prior to the joinder of issues on the merits between the parties herein, the defendant Becko instituted proceedings in the Probate Division of the District Court of Tulsa County, Oklahoma (formerly the County Court of Tulsa County, Oklahoma) in which he sought to have the plaintiff's deed of December 3, 1965 approved. Following institution of such approval proceedings, the plaintiff filed in this cause her motion for a preliminary injunction seeking to enjoin the defendants from continuation of the approval proceedings in State Court. Thereafter and before the issues were joined by the parties on the merits of this cause, hearings were held on plaintiff's Motion for Preliminary Injunction and evidence introduced by plaintiff in support thereof. The defendants introduced no evidence at such hearings. Thereafter, on April 19, 1974, this Court entered its Order herein denying plaintiff's Motion for Preliminary Injunction. The plaintiff thereupon appealed the Order denying preliminary injunction to the United States Court of Appeals, Tenth Circuit (Case No. 74–1286). On December 12, 1974, the Court of Appeals, in a divided opinion, found that the evidence introduced by the plaintiff at the preliminary injunction hearing was sufficient to show a probable right in the plaintiff to the relief sought in this cause and a probable danger that irreparable injury would result to the plaintiff if the preliminary injunction was not granted. Accordingly, the judgment of this Court on the matter of the preliminary injunction was reversed and the cause remanded. *Armstrong v. Maple Leaf Apartments, Ltd., et al.*, 508 F.2d 518 (10th Cir. 1974). This Court thereupon issued its Preliminary Injunction in accordance with such Circuit Court opinion. Thereafter, the defendants filed their respective answers and counterclaims seeking to quiet their respective titles in and to the subject real property as against the plaintiff and her husband and the issues were joined upon the merits of this cause.

On the 1st day of June, 1977, the above styled and numbered cause came on for trial before the undersigned Chief United States District Judge for the Northern District of Oklahoma. The plaintiff introduced her evidence and rested. The defendants introduced their evidence and, at the conclusion thereof, moved this Court to amend their pleadings to conform to the evidence, which motion was granted. The defendants thereupon rested. At the conclusion of the trial, on June 6, 1977, and following arguments of counsel for the parties, the Court took this case under advisement. The Court, having examined all pleadings on file herein, having given due consideration to the testimony of witnesses and litigants sworn and examined in open court, their demeanor, intelligence, knowledge and credibility, and due consideration to all other evidence introduced in this cause by the parties hereto, having given due consideration to the arguments of counsel and the authorities submitted by the parties herein, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. It is significant to note that the evidence presented and the issues raised in the trial on the merits of this cause materially and substantially differ from the evidence and issues that were before this Court and the Circuit Court of Appeals in connection with the preliminary injunction proceedings heretofore conducted in this cause.

2. This is an action in which the plaintiff seeks to quiet title against the defendants to the following described real property situated in Tulsa County, State of Oklahoma, to-wit:

Lots One (1), Two (2) and Three (3), Block One (1), and Lots One (1) and Two (2), Block Two (2), Maple Leaf Addition, an Addition to the City of Broken Arrow, Tulsa County, State of Oklahoma, according to the recorded plat thereof,

together with all improvements thereon and rights and appurtenances thereunto belonging. In this action, the plaintiff seeks further to void and cancel that certain General Warranty Deed dated December 3, 1965, made, executed and delivered by the plaintiff and her husband, Ruskin Armstrong, to the defendant H. Harold Becko covering the above described real property and premises. The plaintiff likewise seeks in this action to recover possession of the above described real property together with all improvements thereon. The defendant Maple Leaf Apartments, Ltd., by Counterclaim, seeks to quiet its title in and to Lot One (1), Block Two (2) of said Maple Leaf Addition as against the plaintiff and her said husband, said defendant having acquired its title thereto by mesne conveyances from the defendant H. Harold Becko. The defendants Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, by Counterclaim, seek to quiet their title to the remainder of the said Maple Leaf Addition against the plaintiff and her husband, the latter defendants having likewise acquired their title by mesne conveyances from the defendant H. Harold Becko. At the time of the conveyance of December 3, 1965 by plaintiff and her husband to the defendant H. Harold Becko, the above described real property was not platted and was, in fact, conveyed by metes and bounds. (Defendants' Exhibit No. 6)

3. The plaintiff predicates her right to quiet title to the subject real property and to possession thereof and to cancellation of the deed of December 3, 1965 upon the Act of Congress of August 4, 1947. It is the contention of the plaintiff that under the terms of the Act of August 4, 1947, the subject real property became restricted against alienation by the plaintiff; that any deed of conveyance thereto by her must be approved by the County Court of Tulsa County, Oklahoma, which approval has not been obtained; that accordingly, the deed of conveyance of December 3, 1965 to the defendant H. Harold Becko is invalid and vested no title in him in and to the subject real property. It is the contention of the defendants that the Act of August 4, 1947 as applied to the facts and circumstances of this case is unconstitutional and that, in any

event, such Act creates no more than a rebuttable presumption of incompetency and overreaching, which presumption defendants contend has been clearly rebutted by the evidence introduced in this cause. The defendants further contend that the plaintiff is guilty of laches in asserting her claim to title and possession of the subject property and that the plaintiff comes into equity seeking quiet title and cancellation of deed with unclean hands and is therefore not entitled to such equitable relief.

4. The subject real property is a part of the surplus allotment of one Billy Atkins who was duly enrolled March 13, 1902 on the rolls of the Creek Nation, Five Civilized Tribes, opposite Roll No. 826, as a full-blood Creek Indian. (Plaintiff's Exhibit No. 2) On May 6, 1903, the said Billy Atkins was allotted as his surplus allotment, by deed issued by the Muskogee Creek Nation, the following described real property, to-wit:

The East Half of the Northwest Quarter (E/2 NW/4) and the Southwest Quarter of the Northwest Quarter (SW/4 NW/4) of Section 14, Township 18 North, Range 14 East of the Indian Base & Meridian, in Indian Territory, containing one hundred twenty (120) acres, more or less, according to the United States survey thereof. (Plaintiff's Exhibit No. 1)

That upon admission of Oklahoma to statehood, such real property became a part of Tulsa County, State of Oklahoma.

5. On April 24, 1929, the said Billy Atkins died intestate in Wagoner County, Oklahoma, seized and possessed of his above described surplus allotment. (TR. 112 and Plaintiff's Exhibit No. 6) The Estate of Billy Atkins was probated in Wagoner County, Oklahoma. (TR. 25 and Plaintiff's Exhibit No. 6) At the time of his death, Billy Atkins was a resident of Wagoner County, Oklahoma, which county had been his principal residency during his lifetime. (TR. 24) At no time during the lifetime of the plaintiff did Billy Atkins reside on any part of his above described surplus allotment. (TR. 24 & 37)

6. At the time of Billy Atkins' death, April 24, 1929, he left surviving as his sole and only heirs-at-law three (3) children, namely, the plaintiff herein, Nellie Atkins Armstrong, her brother Legus Atkins, and her brother Eddie Atkins. (TR. 12–13 and Plaintiff's Exhibit No. 6) Said heirs were half-blood Creek Indians and inherited an undivided one-third (⅓) interest each in and to the above-described surplus allotment of Billy Atkins. (TR. 86 & 13 and Plaintiff's Exhibit No. 6)

7. On June 27, 1944, the plaintiff and her brother, Eddie Atkins, joined by their respective spouses, conveyed by Quit-Claim Deed to Legus Atkins the following described portion of the foregoing surplus allotment of Billy Atkins:

The East Half of the West Half of the Northwest Quarter (E/2 W/2 NW/4) of Section 14, Township 18 North, Range 14 East, Tulsa County, Oklahoma. (Plaintiff's Exhibit No. 3)

On the same date, June 27, 1944, the plaintiff and her brother, Legus Atkins, joined by their respective spouses, conveyed by Quit-Claim Deed to Eddie Atkins the following described portion of the foregoing surplus allotment of Billy Atkins:

The West Half of the West Half of the Northwest Quarter (W/2 W/2 NW/4) of Section 14, Township 18 North, Range 14 East, Tulsa County, Oklahoma. (Plaintiff's Exhibit No. 5)

On the same date, June 27, 1944, Legus Atkins and Eddie Atkins, joined by their respective spouses, conveyed by Quit-Claim Deed to the plaintiff herein the following described portion of the foregoing surplus allotment of Billy Atkins:

The Southeast Quarter of the Northwest Quarter (SE/4 NW/4) of Section 14, Township 18 North, Range 14 East, Tulsa County, Oklahoma. (Plaintiff's Exhibit No. 4)

The real property which is the subject of this action is a part of the latter described real property acquired by the plaintiff, one-third (⅓) by inheritance from her father, Billy Atkins, and the remaining two-thirds (⅔) by virtue of the latter described Quit-Claim Deed (Plaintiff's Exhibit No. 4) from Legus Atkins and Eddie Atkins and their respective spouses.

8. On November 18, 1964, the plaintiff, Nellie Armstrong, and her husband, Ruskin Armstrong, as "Optionor", made, executed and delivered to one Dale A. Liles and one James W. Barry, as "Optionees", an exclusive option and privilege to purchase for a total purchase price of One Hundred Thousand and No/100 Dollars ($100,000.00), the subject real property, together with all improvements thereon and appurtenances thereto belonging. (Defendants' Exhibit No. 3) The plaintiff was paid the sum of Two Thousand and No/100 Dollars ($2,000.00) as consideration for the granting of this option. (TR. 46 & 453 and Defendants' Exhibit No. 3) The option consideration was not to be applied against the purchase price in the event of the exercise of the option by the Optionees. (TR. 57–58 & 453 & 465 and Defendants' Exhibit No. 3) The option was for a term of six (6) months, to expire on May 18, 1965, but contained a provision for renewal of the option for an additional term of six (6) months upon the payment by the Optionees to the plaintiff of an additional sum of Two Thousand and No/100 Dollars ($2,000.00). (Defendants' Exhibit No. 3) On May 17, 1965, the Optionees did, in fact, renew the option for an additional term of six (6) months, and did, in fact, pay to the plaintiff and her husband the required sum of Two Thousand and No/100 Dollars ($2,000.00) for such renewal. (Defendants' Exhibit No. 1) The latter sum likewise was not to be credited against the $100,000.00 purchase price in the event of the exercise of the option. (TR. 57–58 & 465 and Defendants' Exhibits Nos. 1, 2 and 3) This option, by its own terms, would have expired on November 18, 1965 unless exercised. This option was not exercised and expired on November 18, 1965 and the plaintiff retained the $4,000.00 option consideration paid.

Negotiations resulting in this option agreement of November 18, 1964 were initiated in the fall of 1964 when the plaintiff and her husband advised the Optionee, James W. Barry, that they were interested in selling the real property which is the subject of this lawsuit, in order that they might buy a new home. (TR. 443–445)

The original offer by the Optionee, James W. Barry, for the subject real property was the sum of $50,000.00 and negotiations proceeded in increments of $10,000.00 until the final purchase price of $100,000.00 contained in the option agreement was, in fact, agreed to. (TR. 449–451) In the negotiation and execution of the option agreement of November 18, 1964, the plaintiff was represented by Mr. F. A. Petrik, attorney at law, of Broken Arrow, Oklahoma. (TR. 45–46 & 203–204) Mr. Petrik has been a practicing attorney in Tulsa County, Oklahoma since 1935 and had been the attorney for the plaintiff and her husband since 1938. (TR. 203)

During the term of the option agreement of November 18, 1964, the Optionees spent several thousands of dollars in obtaining annexation of the property to the City of Broken Arrow, Oklahoma, in preparing and processing through four public hearings two (2) rezoning applications with the Planning Commission and City Commission of the City of Broken Arrow, Oklahoma, and in preparing and filing a District Court suit to rezone such property when the zoning was denied by the City, in negotiating for financing of improvements on the subject real property, in obtaining feasibility studies for the subject real property, and in negotiating leases with prospective tenants of improvements to be placed on the subject property. (TR. 468) The annexation petition, the two rezoning applications and the District Court rezoning petition were each signed by the plaintiff and her husband. (TR. 457–461) The plaintiff and her husband were kept advised currently by the Optionees of the progress of the annexation, zoning, financing and leasing of the optioned real property. (TR. 463) At no time did the plaintiff or her husband or their attorney, F. A. Petrik, request or demand termination of the option agreement of November 18, 1964, or express to the Optionees any dissatisfaction therewith. (TR. 468)

On October 5, 1965, the interest of the Optionees in the option agreement of November 18, 1964 was purchased by the de-

fendant H. Harold Becko. (TR. 179) Immediately after the purchase of the option by defendant Becko, the plaintiff and her husband were advised thereof. (TR. 180–181)

9. The defendant H. Harold Becko did not exercise the option of November 18, 1964 which he had purchased from Liles and Barry because of knowledge that the plaintiff and her husband were not going to permit the exercise of such option without the payment of additional money or without litigation in the event enforcement of the option agreement was sought. (TR. 185) In lieu thereof, the defendant Becko submitted to the plaintiff and her attorney, F. A. Petrik, a proposed new option agreement calling for the same total purchase price of $100,000.00, but payable in fourteen (14) months in lieu of five (5) years. (Defendants' Exhibit No. 4 and TR. 181–182) The plaintiff refused to accept the proposed new option (Defendants' Exhibit No. 4) because the plaintiff wanted more money for the land. (TR. 182)

Following rejection of the original proposed new option agreement of defendant Becko, a second new option agreement on mutually satisfactory terms was, in fact, negotiated between the plaintiff and her husband, as "Optionors", and the defendant H. Harold Becko, as "Optionee", which final option agreement was duly executed and acknowledged by the parties thereto on November 12, 1965. (TR. 182–184 and Defendants' Exhibit No. 5) The latter option agreement covered the real property which is the subject of this lawsuit (Defendants' Exhibit No. 5) and was for a term of thirty (30) days. (TR. 184 and Defendants' Exhibit No. 5) The executed option agreement of November 12, 1965 materially differed from the former Barry and Liles option of November 18, 1964 in the following respects:

(a) The Becko option agreement increased the total purchase price to be paid the plaintiff from $100,000.00 to $107,500.00; and,

(b) The Becko option was for a term of thirty (30) days with no renewal provisions, while the Barry and Liles option

was for a term of six (6) months with a six (6) months' renewal provisions; and,

(c) The Becko option required the payment of the purchase price in two (2) payments over a period of fourteen (14) months, while the Barry and Liles option provided for five (5) payments over a period of five (5) years; and,

(d) The Becko option agreement permitted the plaintiff to retain possession of the improvements on the optioned property until development, whereas the Barry and Liles option did not. [TR. 184–185 & 478 & 65–66 and Defendants' Exhibits Nos. 3 and 5]

During the negotiation of the executed option agreement of November 12, 1965 with defendant Becko and prior to its execution, the plaintiff and her husband received tax counsel and advice with regard thereto from a certified public accountant (TR. 86) and from the Field Solicitor of the Bureau of Indian Affairs. (TR. 440–441 and Defendants' Exhibit No. 34) Also, during the negotiation and execution of such option agreement, the plaintiff and her husband received legal counsel and advice from their attorney, F. A. Petrik. (TR. 61 & 474–481)

On December 3, 1965, the defendant H. Harold Becko exercised his aforesaid option of November 12, 1965 and the parties to the latter option agreement met in the office of F. A. Petrik in Broken Arrow, Oklahoma and concluded the Contract of Sale resulting from the exercise of the option. (TR. 481–482 & 186) At the time and place of closing, the plaintiff and her husband duly executed, acknowledged and delivered to the defendant H. Harold Becko a General Warranty Deed to the real property which is the subject of this lawsuit, said General Warranty Deed being dated December 3, 1965 and duly acknowledged said date before F. A. Petrik. (Defendants' Exhibit No. 6 and TR. 482 & 70–71) At the same time and place, the defendant Becko paid to the plaintiff, pursuant to the terms of the option agreement and resulting Contract of Sale, the sum of Twenty-nine Thousand and No/100 Dollars ($29,000.00) and duly exe-

cuted and delivered to the plaintiff two (2) promissory notes of even date, one such note being in the principal sum of Thirty-five Thousand Five Hundred and No/100 Dollars ($35,500.00) having a final maturity date of December 19, 1966 (Defendants' Exhibit No. 29), and one note in the principal sum of Forty-three Thousand and No/100 Dollars ($43,000.00) having a final maturity date of January 19, 1967 (Defendants' Exhibit No. 30). At the same time and place, the defendant Becko made, executed and delivered to the plaintiff a Real Estate Mortgage to secure said promissory notes. (Defendants' Exhibit No. 17 and TR. 71 & 482 & 189) The peaceable and voluntary possession of the subject real property was delivered by the plaintiff and her husband to the defendant Becko approximately one and one-half (1½) years following delivery by plaintiff to defendant Becko of the deed thereto. (TR. 190)

10. The execution and delivery of the option agreement of November 12, 1965 by the plaintiff and her husband to the defendant H. Harold Becko, and the execution, acknowledgement and delivery of the General Warranty Deed of December 3, 1965 by the plaintiff and her husband to the defendant Becko were each the free and voluntary acts of the plaintiff and her husband, Ruskin Armstrong.

11. At the time of the negotiation, execution and delivery to the defendant H. Harold Becko of the option agreement of November 12, 1965, and at the time of the execution and delivery to the defendant Becko of the General Warranty Deed of December 3, 1965, the plaintiff was forty-five (45) years of age (TR. 10), had received a formal education in the Public Schools of the City of Tulsa, Oklahoma, had owned and operated a business with her husband, had negotiated the purchase and sale of several tracts of real property, and had negotiated several loan and other business transactions. (TR. 26 & 50 & 436)

12. The proceeds of the sale of the subject real property by plaintiff to defendant H. Harold Becko were used by the plaintiff to pay debts, to build and furnish a quality

residence, and to purchase a farm in Wagoner County, Oklahoma. (TR. 76–77 & 82 and Defendants' Exhibit No. 26)

13. On December 1, 1965, and two (2) days prior to the closing of the real estate sales transaction with defendant H. Harold Becko and delivery to him of a General Warranty Deed to the real property which is the subject of this action, the plaintiff and her husband contracted to purchase the real property on which the plaintiff's quality home was erected from one Amos Beaver; that Amos Beaver was a Creek Indian, and the contract of purchase specifically provided that the deed to be given by Amos Beaver to the plaintiff and her husband was subject to the approval of the Department of Interior, Office of Indian Affairs, and the County Court of Tulsa County, Oklahoma; that pursuant to said agreement, Amos Beaver and Stella Beaver, his wife, made, executed and delivered to the plaintiff and her husband a General Warranty Deed on said December 1, 1965, two (2) days prior to plaintiff's deed to defendant Becko (Defendants' Exhibit No. 25); that said proceedings for approval of such deed were, in fact, conducted in the County Court of Tulsa County, Oklahoma, and the attorney preparing and processing such approval proceedings was, in fact, the plaintiff's attorney, F. A. Petrik. (Defendants' Exhibit No. 25)

14. Since 1938, Mr. F. A. Petrik of Broken Arrow, Oklahoma served as the attorney for the plaintiff and her husband. (TR. 76 & 203) Mr. Petrik is and was an experienced title and probate attorney. (TR. 223) Mr. Petrik served as the plaintiff's and her husband's counsel in the exchange of Quit-Claim Deeds between the plaintiff and her two brothers, in the negotiation, preparation, approval and execution of the Becko option agreement of November 12, 1965, as well as the former Barry and Liles option agreement of November 18, 1964. Likewise, Mr. Petrik represented the plaintiff at the closing of the real estate sales transaction between the plaintiff and defendant H. Harold Becko culminating in the execution and delivery by the plaintiff and her hus-

band to defendant Becko of the General Warranty Deed of December 3, 1965 covering the subject real property. (TR. 203–204 & 219–220 & 45–46 & 61 & 474–482 & 186) Contrary to the testimony given at the preliminary injunction hearing in this matter in April, 1974 and the implications therefrom, Mr. Petrik did, in fact, know that the plaintiff was a one-half (½) blood Creek Indian who had inherited the subject real property from her full-blood father, Billy Atkins (TR. 220–222 and Defendants' Exhibits Nos. 31 and 32) and Mr. Petrik had, in fact, during the period from August 4, 1947 to and including December 3, 1965, prepared, processed and conducted several approval proceedings in the County Court of Tulsa County, Oklahoma for the approval of deeds of Indian heirs. (TR. 224) One such proceeding was the sales transaction between the plaintiff herself and Amos Beaver referred to in Finding of Fact No. 13 immediately above.

15. The defendant H. Harold Becko did not pay to the plaintiff the $35,500.00 promissory note given to her as a part of the purchase price of the subject real property when the same became due on December 19, 1966, but defaulted therein and in the Purchase Money Real Estate Mortgage given to secure the same. (TR. 229 & 190–191 & 483–484) No suit was instituted by the plaintiff on said note or to foreclose such mortgage by reason of such default. Likewise, the defendant Becko failed to pay the $43,000.00 promissory note given to the plaintiff as part of the purchase price of the subject real property when the same became due on January 19, 1967 and defaulted therein and in the Purchase Money Real Estate Mortgage given to secure the same. (TR. 229 & 191 & 484) Again no suit was instituted by the plaintiff on the latter described promissory note or to foreclose her real estate mortgage securing the same by reason of the latter default. (TR. 191) Thereafter, on the 28th day of January, 1967, the plaintiff and her husband met the defendant Becko at the First National Bank of Broken Arrow, Oklahoma. At the latter time and place, the defendant Becko tendered the amount of the two notes in de-

fault and requested a release of the plaintiff's Purchase Money Real Estate Mortgage but the plaintiff refused to execute and deliver a release of such mortgage unless the defendant Becko paid to the plaintiff approximately $4,500.00 estimated to be the additional income taxes the plaintiff would be required to pay because of receipt of payment of both notes in the same calendar year of 1967. (TR. 74 & 192–193) In order to obtain the release of mortgage, the defendant Becko did, in fact, pay to the plaintiff the additional sum of approximately $4,500.00, as well as the balance of the purchase price of the subject real property evidenced by these two promissory notes and real estate mortgage. (TR. 74 & 192–193) Thereupon, the plaintiff, Nellie Armstrong, joined by her husband, Ruskin Armstrong, duly executed, acknowledged and delivered to the defendant Becko a release of the Purchase Money Mortgage of December 3, 1965. (TR. 74 & 193 and Defendants' Exhibit No. 18)

16. In 1968, plaintiff and her husband delivered peaceable possession of the subject real property to defendant H. Harold Becko and moved into their new home at 91st Street and Lynn Lane in the City of Broken Arrow, Oklahoma. (TR. 77 & 189–190 & 195)

17. The plaintiff received from the defendant H. Harold Becko as the total purchase price of the subject real property the sum of $107,500.00. (TR. 186 & 191–192 & 75) The fair market value of the subject property at the time of its sale by plaintiff to defendant Becko and delivery of General Warranty Deed thereto on December 3, 1965 was the sum of $91,900.00 (TR. 351 & 360 & 364 and Defendants' Exhibit No. 33) or $15,600.00 less than the amount received for such property by the plaintiff. The Court-appointed appraisers in this cause each testified that they had to strain to get the value of the subject property as of the date of conveyance by plaintiff up to the figure of $91,900.00. (TR. 355 & 360 & 365) The purchase price received by the plaintiff exceeded its fair market value on December 3, 1965 by approximately seventeen percent

(17%). This excess in value of the purchase price paid over the fair market value of the real property at the time of purchase does not include the $4,000.00 option consideration received by the plaintiff from James W. Barry and Dale A. Liles, nor does the same include the approximate $4,500.00 additional sum paid by the defendant H. Harold Becko to the plaintiff to procure a release of the Purchase Money Mortgage. On the date of conveyance of the subject real property by the plaintiff to the defendant H. Harold Becko, December 3, 1965, the subject property was substantially unimproved, was being devoted to agricultural purposes, was unplatted and unzoned. (TR. 35 & 334 & 365 & 447 and Defendants' Exhibit No. 6)

18. On the 18th day of December, 1971, the defendant Broken Arrow's Mall, Inc. acquired title to the subject real property through mesne conveyances from the defendant H. Harold Becko. On February 17, 1971, the defendant Broken Arrow's Mall, Inc. platted the property into Maple Leaf Addition to the City of Broken Arrow, Oklahoma. (Defendants' Exhibit No. 7) Thereafter, such defendant developed the subject real property and on the 25th day of February, 1972, said defendant obtained a $1,150,000.00 loan from the defendant Sackman-Gilliand Corporation on Lot One (1), Block Two (2) of Maple Leaf Addition for the construction of the Maple Leaf Apartment project. (TR. 494–496) Prior to commencement of construction of such apartment project, the defendant Broken Arrow's Mall, Inc. conveyed said Lot One (1), Block Two (2), Maple Leaf Addition to the defendant Maple Leaf Apartments, Ltd., who assumed the $1,150,000.00 construction loan. (TR. 494–496) Thereafter, the defendant Broken Arrow's Mall, Inc. conveyed the balance of Maple Leaf Addition, consisting of Lots One (1), Two (2) and Three (3), Block One (1), and Lot Two (2), Block Two (2), to the defendants Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, for the total purchase price of $280,000.00. (TR. 499 & 514 & 519–520) Neither the defendant Maple Leaf Apartments, Ltd. nor the defendants Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, have conveyed any portion of the subject real property so acquired by them.

19. Subsequent to the conveyance of the subject real property by the plaintiff to defendant H. Harold Becko on December 3, 1965 and prior to the institution of this lawsuit by the plaintiff on February 22, 1974, the subject real property was developed by the defendants Maple Leaf Apartments, Ltd. and Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, and the following improvements constructed thereon:

(a) An apartment project known as Maple Leaf Apartments was constructed on Lot One (1), Block Two (2), of said Maple Leaf Addition by the defendant Maple Leaf Apartments, Ltd.;

(b) A shopping center known as Maple Leaf Shopping Center was constructed on Lot Two (2), Block Two (2) of said Maple Leaf Addition, less and except the North one hundred fifty feet (150') thereof, by the defendants Owen D. Young and Robert L. Latch; and,

(c) Construction of an additional apartment project was commenced on Lot One (1), Block One (1) of Maple Leaf Addition by the defendants Owen D. Young and Robert L. Latch.

Construction of the Maple Leaf Apartments project was commenced by the defendant Maple Leaf Apartments, Ltd. in the year 1973 and completed by it in December, 1973. (TR. 505) This apartment complex contains one hundred sixteen (116) dwelling units, most of which have been leased by defendant Maple Leaf Apartments, Ltd. and are occupied by their tenants. (TR. 499 & 503) The project contains ten (10) major buildings and two (2) auxiliary buildings. (TR. 502) The auxiliary buildings consist of a laundry and clubhouse or cabana building used in conjunction with the project's swimming pool. (TR. 502) The total cost incurred by the defendant Maple Leaf Apartments, Ltd. in the development, construction and furnishing of this

apartment project was the sum of $1,407,929.25. (TR. 496) The interim or construction loan of defendant Sackman-Gilliand on this apartment project was converted to a permanent loan in the year 1973, the unpaid balance of such loan on the date of trial being the sum of $1,135,610.17. (TR. 496 & 498) A substantial amount of time, effort and money was expended and risk assumed by the defendant Maple Leaf Apartments, Ltd. and its individual partners in the planning, financing, development, construction and leasing of the Maple Leaf Apartments complex.

20. The defendants Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, commenced construction of the Maple Leaf Shopping Center in the year 1973 and had substantially completed and leased the Center by October, 1973. (TR. 528 & 539) The shopping center was constructed on Lot Two (2), Block Two (2), Maple Leaf Addition, less and except the North one hundred fifty feet (150') thereof. (TR. 516) The total cost expended by these defendants in the development, leasing and construction of the shopping center was $388,127.31. (TR. 529) The construction loan on the subject shopping center in the principal sum of $320,000.00 was made by the defendant First National Bank & Trust Company of Tulsa, Oklahoma, a national banking association, and remains outstanding. (TR. 525 & 546 & 548) The defendants Owen D. Young and Robert L. Latch have expended considerable time, effort and money and assumed substantial risks in the acquisition, financing, development, construction and leasing of this shopping center. The promissory note evidencing the construction loan of $320,000.00 on this shopping center was personally executed by the defendants Owen D. Young and Robert L. Latch and their respective spouses, and there is no exoneration or exculpatory clause contained in such note or the real estate mortgage securing the same (TR. 526) None of the principal indebtedness of $320,000.00 has been paid and interest has continued to accrue since the filing of this lawsuit on February 22, 1974. (TR. 548-549)

21. The North one hundred fifty feet (150') of Lot Two (2), Block Two (2), and Lots Two (2) and Three (3), Block One (1) of Maple Leaf Addition located immediately adjacent to and north of the Maple Leaf Shopping Center is vacant land. (TR. 516-518) In 1973, the defendants Owen D. Young and Robert L. Latch, joined by their respective spouses, procured a mortgage loan in the principal sum of $150,000.00 covering all of the latter described real property. (TR. 521-522 & 546-548) The promissory note evidencing this loan and the mortgage securing the same do not contain any exoneration or exculpatory provisions. None of the principal of this mortgage indebtedness has been paid and interest has continued to accrue thereon since the filing of the subject lawsuit on February 22, 1974. (TR. 548)

22. In July, 1973, the defendants Owen D. Young and Robert L. Latch procured an interim or construction mortgage loan in the sum of $975,000.00 from the defendant Hamilton Investment Trust for the construction of a ninety-five (95) unit apartment complex on that part of the subject property described as Lot One (1), Block One (1), Maple Leaf Addition. (TR. 545) The promissory note evidencing this interim or construction loan was personally executed by the defendants Owen D. Young and Robert L. Latch and contained a guaranty of performance commitment by such defendants. (TR. 548) At the time this lawsuit was commenced on February 22, 1974, the defendants had obtained their building permit for this apartment project, had hired a general contractor therefor, had hired an architect and completed the plans and specifications for the apartments, and had already completed 95% of the excavation work for the 95-unit apartment project. (TR. 541-542) At the time of commencement of this suit, approximately $173,000.00 of this interim loan had been drawn down by the defendants. (TR. 547) None of this mortgage indebtedness has been repaid to the defendant Hamilton and interest has continued to accrue thereon since the date of filing of the instant lawsuit. (TR. 548)

23. The Court-appointed appraisers in this cause made the following findings of fair market value of the subject real property and improvements as of the dates indicated (Defendants' Exhibit No. 33):

A. The value of all of the subject land on December 3, 1965 (date of conveyance by plaintiff to defendant Becko): $ 91,900.00

B. The value of all of the subject land, exclusive of improvements, on February 22, 1974 (date this suit was filed):

(i) Lot One (1), Block One (1), Maple Leaf Addition $ 91,591.00

(ii) Lots Two (2) and Three (3), Block One (1) and the North one hundred fifty feet (150') of Lot Two (2), Block Two (2), Maple Leaf Addition 93,638.00

(iii) Lot Two (2), Block Two (2), Maple Leaf Addition, less the North one hundred fifty feet (150') thereof 93,557.00

(iv) Lot One (1), Block Two (2), Maple Leaf Addition 186,096.00
TOTAL VALUE: $ 464,882.00

C. The value of all of the subject land, including improvements, on February 22, 1974 (date this suit was filed):

(i) Lot One (1), Block One (1), Maple Leaf Addition $ 91,591.00

(ii) Lots Two (2) and Three (3), Block One (1), and the North one hundred fifty feet (150') of Lot Two (2), Block Two (2), Maple Leaf Addition 93,638.00

(iii) Lot Two (2), Block Two (2), Maple Leaf Addition, less the North one hundred fifty feet (150') thereof 392,947.00

(iv) Lot One (1), Block Two (2), Maple Leaf Addition 1,130,509.00
TOTAL VALUE: $1,708,685.00

24. Prior to their acquisition of Lots One (1), Two (2) and Three (3), Block One (1) and Lot Two (2), Block Two (2) of Maple Leaf Addition, the defendants Owen D. Young and Robert L. Latch employed the services of an attorney to examine the title to all of said real property and did, in fact, obtain a written title opinion as to all of the same prior to the acquisition thereof. (TR. 521 & 523) Likewise, the defendants Bro-ken Arrow's Mall, Inc. and Maple Leaf Apartments, Ltd. employed the services of an attorney and acquired a title opinion to the subject property prior to their acquisition of any interest therein. (TR. 511–512) The defendant H. Harold Becko likewise employed the services of attorney Charles Whitebook for examination of title to the subject real property prior to purchasing the same from the plaintiff and said attorney did render a written title opinion thereon. (TR. 13–14 and Plaintiff's Exhibit No. 5) None of such title opinions procured by any of said defendants questioned the validity of the deed of December 3, 1965 or referred to any restrictions imposed upon the transfer of the subject property by the Act of August 4, 1947. (TR. 485 & 521) In fact, one abstract company in Tulsa, Oklahoma has in its files alone thirty-five (35) title opinions involving titles deraigned from the 120-acre surplus allotment of Billy Atkins in which no requirement was made with regard to approval of conveyances or relating to the restrictions against alienation imposed by the Act of August 4, 1947. The overwhelming majority of these title opinions were rendered after 1947. (TR. 489)

25. Subsequent to passage of the Act of August 4, 1947, and prior to execution and delivery of the Deed of Conveyance of December 3, 1965 sought to be declared invalid by the plaintiff in this action, the plaintiff conveyed to various third parties substantially all of the land owned by her and comprising a part of the surplus allotment of her father, Billy Atkins, and not included in the subject sale to defendant Becko, and during such period granted easements and other encumbrances to third parties covering lands owned by her and comprising a part of the surplus allotment of Billy Atkins. (TR. 432–435 & 36 & 39–40 & 50) None of said conveyances, easements and encumbrances to third parties (i.e., parties not defendant herein and parties not related to plaintiff) were approved by the County Court of Tulsa County, Oklahoma, or any other court nor was such approval sought. (TR. 432–435) The plaintiff has not sought to void any conveyance, easement or en-

cumbrance granted by her on any part of the lands owned by her and comprising a part of the surplus allotment of Billy Atkins, save and except the conveyance of the subject property to the defendant H. Harold Becko involved in this case. (TR. 335) Since the filing of the instant lawsuit, the plaintiff has been requested by the grantee in one of such conveyances, the City of Broken Arrow, Oklahoma, to consent to approval of its conveyance from plaintiff, which request of such City was granted by the plaintiff conditioned upon payment to plaintiff by the City of Broken Arrow, Oklahoma of the sum of $2,500.00 for such consent. (TR. 83–86 & 91–92) Such sum was exacted and paid by the City of Broken Arrow, Oklahoma to obtain the plaintiff's consent. (TR. 92) Since 1947, some sixty (60) further deeds, in addition to mortgages and other encumbrances have been filed of record involving titles deraigned from the surplus allotment of Billy Atkins, none of which have been approved by the County Court of Tulsa County, Oklahoma, nor has approval thereof been requested or sought. (TR. 485–489) Many homes have been built on a part of the land acquired by the plaintiff from Billy Atkins and deeded to third parties not involved in this litigation, which accounts for this quantity of unapproved deeds. (TR. 488–489)

26. Although the testimony introduced herein was to the effect that the exchange of Quit-Claim Deeds between the plaintiff and her brothers referred to above in Finding of Fact No. 7 was for the purpose of accomplishing a voluntary partition of the surplus allotment of Billy Atkins, only the Quit-Claim Deed to the plaintiff from her brothers and their spouses appears in the abstracts of title to the subject real property examined by the defendants. (TR. 337–338) The two Quit-Claim Deeds received by the two brothers on the balance of the surplus allotment of Billy Atkins do not appear therein as neither Quit-Claim Deed covers any part of the subject real property. (Defendants' Exhibits Nos. 8 and 9) The Quit-Claim Deeds themselves make no reference to an exchange of deeds or partition but contain recitations of consideration re-

ceived. (Defendants' Exhibits Nos. 8, 9 and 10) There is no way the defendants could, from abstracts of title or land records of the subject property, have determined that there was an exchange of Quit-Claim Deeds in lieu of an actual purchase by plaintiff of her brothers' interest in the subject real property. No evidence was introduced in this lawsuit that any of the defendants or their predecessors in title to the subject real property had any actual knowledge of the two Quit-Claim Deeds given to the plaintiff's brothers, Legus Atkins and Eddie Atkins.

27. The plaintiff, Nellie Armstrong, admittedly observed on numerous occasions the Maple Leaf Apartments being constructed and leased, the Maple Leaf Shopping Center being constructed and leased, and the excavation being made for the 95-unit apartment complex on Lot One (1), Block One (1), Maple Leaf Addition prior to the filing by her of this lawsuit, but at no time prior to the filing of this lawsuit did the plaintiff demand or request of any defendant in this lawsuit a return of title or possession of any part of the subject real property conveyed by her to Harold Becko on December 3, 1965, or otherwise make known any claim by her thereto. (TR. 81–82) The plaintiff remained silent as to any claim by her to the subject property during the entire period that the defendants Maple Leaf Apartments, Ltd. and Owen D. Young and Robert L. Latch were expending readily observable and substantial amounts of money and time in the improvement of the subject property. (TR. 81 & 195–196 & 551) Less than 120 days expired between the time of formal opening of the shopping center in October, 1973 and completion and leasing of the Maple Leaf Apartment project in December, 1973, and the filing of the instant litigation on February 22, 1974.

28. The Act of August 4, 1947 was never codified. (TR. 400) It does not appear in the United States Code, nor does the text of the Act appear anywhere in the United States Code Annotated. (TR. 400) The only reference to the Act is contained in a footnote in the United States Code. (TR.

400) The existence of the Act of August 4, 1947 is not generally known among the legal profession in the State of Oklahoma. (TR. 398–400 & 488–490) Such is evidenced by the fact that none of the conveyances from the plaintiff to any part of the surplus allotment of Billy Atkins acquired by her were approved or sought to be approved by the County Court of Tulsa County, Oklahoma prior to the filing of the instant lawsuit and is evidenced by the large number of conveyances of title deraigned from the plaintiff to a part of such surplus allotment that have not been approved or approval thereof requested, and as evidenced by the large number of title opinions since 1947 covering lands comprising a part of the surplus allotment of Billy Atkins in which absolutely no reference to required approval or restrictions is made. Lack of knowledge of this Act and its applicability is further indicated by the testimony of the Field Solicitor of the Bureau of Indian Affairs. (TR. 397–400)

29. Of all the conveyances by the plaintiff of a part of the surplus allotment of Billy Atkins acquired by her, the only conveyance which the plaintiff has sought to set aside is the conveyance of December 3, 1965 to the defendant H. Harold Becko, now platted as Maple Leaf Addition. (TR. 335) It is the only conveyance on which improvements of substantial value and which are readily marketable have been placed.

30. It is the opinion of the United States Probate Attorney for the Bureau of Indian Affairs and the Field Solicitor for the Bureau of Indian Affairs that upon the death of Billy Atkins on April 24, 1929 his 120-acre surplus allotment was inherited by his three half-blood unenrolled heirs, including the plaintiff herein, free and clear of any restrictions against alienation. (Defendants' Exhibit No. 32 and TR. 106 & 119–120) It is the opinion of Mr. Harold Shultz, Field Solicitor for the Department of Interior, Bureau of Indian Affairs, that the land remained unrestricted at least until August 4, 1947 (some 18½ years beyond the death of Billy Atkins) and that during such period the plaintiff could have sold, mortgaged, leased, given away or done anything she wanted to with her interest in this land or the proceeds she received from the land. (TR. 106) It is the further opinion of the Field Solicitor for the Department of Interior, Bureau of Indian Affairs, that there is no such thing as a restricted Indian insofar as the Five Civilized Tribes are concerned (TR. 103–104); that members of the Five Civilized Tribes, such as the plaintiff, are not subject to the General Indian Allotment Act (TR. 116); that members of the Five Civilized Tribes, such as the plaintiff, may and do hold title in their own names in fee simple to real property, whereas Indians subject to the General Indian Allotment Act do not hold title in fee simple to lands but are wards of the United States Government who holds title in trust for their benefit (TR. 116); that cases decided under the General Indian Allotment Act are not construing or involving legislation similar to that regulating the Five Civilized Tribes which are controlled by special legislation peculiar to them. (TR. 116)

31. Neither the United States nor the Department of Interior, Bureau of Indian Affairs, or any other agency of the United States, have sought to intervene in the instant lawsuit because plaintiff has never contacted them or requested their assistance in this matter. The Field Solicitor for the Bureau of Indian Affairs has not formed or expressed an opinion as to the merits of the plaintiff's claim in this lawsuit, nor an opinion as to whether the deed of December 3, 1965 is or is not void. (TR. 160–161)

32. The United States Bureau of Indian Affairs does not have or maintain a file of any nature on the plaintiff Nellie Atkins Armstrong, and has stated through their Field Solicitor that they have no reason to do so. (TR. 107) The plaintiff is not and never has been a ward of the United States of America.

33. The testimony of plaintiff that immediately after execution and delivery of the option agreement of November 18, 1964 to James W. Barry and Dale A. Liles she

wanted out of the transaction and continued thereafter to want out of the transaction, but that she was told by her attorney that she could not legally get out of the transaction, is not credible or believable on the basis of the evidence introduced herein at the trial on the merits of this cause. In the first instance, almost a year after the plaintiff had given the Barry and Liles option of November 18, 1964, the plaintiff, with the assistance of tax counsel and the legal counsel of her attorney, F. A. Petrik, negotiated a new option agreement with the defendant H. Harold Becko for more money than provided in the Barry and Liles option of November 18, 1964 which expired by its own terms on November 18, 1965. (TR. 60–63 & 181–185 & 477–480) In addition, the defendant Becko defaulted on the note and purchase money mortgage he gave the plaintiff not once, but twice, and in neither instance did the plaintiff institute or seek to institute foreclosure proceedings. (TR. 190–192 & 483–484) The plaintiff knew of her right of foreclosure (TR. 230) and so did her experienced attorney, Mr. F. A. Petrik, but in lieu of foreclosure, the plaintiff elected to exact $4,500.00 more money from the defendant Becko. (TR. 75 & 192) Further, the plaintiff already had contracted to spend part of the sale proceeds to be received from defendant H. Harold Becko prior to the closing of the sales transaction with defendant Becko and delivery of deed to defendant Becko and prior to receipt of any part of such sales proceeds. (Defendants' Exhibit No. 25) Further, the purpose of the plaintiff in selling the subject property, as declared to Mr. Barry, was to procure a new home (TR. 444), which the plaintiff, in fact, did. (TR. 76–77 & 82)

34. The testimony of plaintiff that she wanted and still wants to retain the subject land because of objections to sale thereof by her husband and her children and because the land is part of her father's surplus allotment is not credible or believable on the basis of the evidence introduced herein at the trial on the merits of this cause. After giving the Barry and Liles option agreement of November 18, 1964, plaintiff's husband actively participated in negotiations for the Becko option of November 12, 1965, executed the District Court rezoning petition for the subject property, was, in fact, the party who received and receipted for the $2,000.00 consideration for extension of the Barry option, and he did, in fact, participate in the negotiation for the $4,500.00 added consideration extracted from defendant Becko by reason of the latter's default. (TR. 42 & 50 & 460–461 & 455 & 191–192 and Defendants' Exhibit No. 2) It was the husband who, in September, 1965, approximately nine (9) months after the granting of the Barry option, sought the tax counsel of the Bureau of Indian Affairs regarding the sales transaction. (Defendants' Exhibit No. 34) The husband likewise participated in the purchase of the new homesite on which the quality home of plaintiff and her husband was built and, together with plaintiff's children and the plaintiff, received the benefits of the consideration paid to plaintiff by defendant Becko. (TR. 52–55 and Defendants' Exhibit No. 25) Insofar as her desire to retain and reside on her father's allotment is concerned, the plaintiff reserved from the conveyance to defendant Becko a portion of such allotment upon which to build a home but, in fact, elected to build her new home on a tract completely removed from any part of her father's allotment. (TR. 37 & 76–77) In addition, her father never had his residence on this part of his surplus allotment and during the lifetime of the plaintiff, the family never resided on any part of the father's surplus allotment. (TR. 37–38 & 24) Plaintiff's father principally lived and worked in Wagoner County, Oklahoma and not in Tulsa County, Oklahoma where this land is situated. (TR. 24) The evidence does not support any sentimental attachment by the plaintiff or her family to the subject land predicated on her father's (Billy Atkins') relationship to the land.

35. The plaintiff knew that she was a half-blood Creek Indian, that her father, Billy Atkins, was a full-blood Creek Indian, that the subject real property was restricted in his hands during his lifetime, that she

had inherited an interest in the subject real property from her father, Billy Atkins, that the plaintiff and her attorney, F. A. Petrik, had engaged in proceedings for the approval of deeds under the Act of August 4, 1947 prior to the conveyance to the defendant H. Harold Becko of December 3, 1965 (Defendants' Exhibit No. 25), and knew or should have known that approval proceedings were necessary for the conveyance to defendant Becko of December 3, 1965. Instead, the plaintiff delayed for eight (8) years and approximately three (3) months asserting any claim that the conveyance to defendant Becko was invalid and in the interim the defendants constructed substantial improvements on the subject real property in reliance on the deed of December 3, 1965 and the silence and acquiescence therein of the plaintiff.

36. The plaintiff's right to relief herein is predicated upon the Act of Congress of August 4, 1947 relating to restrictions applicable to Indians of the Five Civilized Tribes of Oklahoma (Plaintiff's Complaint, Pg. 3). The history of this Act is as follows:

In early 1947, H.R. 3173, relating to restrictions applicable to Indians of the Five Civilized Tribes of Oklahoma and for other purposes, was introduced in the United States House of Representatives and referred by it to its Committee on Public Lands. On May 2, 1947, a public hearing was conducted by the House of Representatives Subcommittee on Indian Affairs of the Committee on Public Lands wherein H.R. 3173 (Act of August 4, 1947) was considered and testimony presented. (Defendants' Exhibit No. 23) On June 30, 1947, the Committee on Public Lands of the House submitted House Report No. 740 (Defendants' Exhibit No. 19) to the House of Representatives recommending passage of H.R. 3173 and on July 7, 1947, such bill passed the House. (Defendants' Exhibit No. 22) On July 14, 1947, the Committee on Public Lands of the United States Senate submitted its Report No. 543 (Defendants' Exhibit No. 20) to the Senate recommending passage of such bill and on July 17, 1947, the legislation passed the Senate. (Defendants' Exhibit No. 21) On August 4, 1947,

said House Bill No. 3173, with minor amendments, was signed into law.

The announced purpose of H.R. 3173 (Act of August 4, 1947), as stated in House Report No. 740 (Defendants' Exhibit No. 19) and Senate Report No. 543 (Defendants' Exhibit No. 20) and as stated on the floor of the House (Defendants' Exhibit No. 22), was *to clarify, cure and stabilize land titles in Oklahoma.*

There is nothing in the history of the Act of August 4, 1947 to indicate that conditions were such as to warrant the reimposition of restrictions upon Indian lands of the Five Civilized Tribes that had become unrestricted by reason of the death of the allottee. (Defendants' Exhibits Nos. 19–23, inclusive) To the contrary, the testimony of Congressman Albert, Congressman Schwabe, W. E. Semple and others appearing before the Congressional Subcommittee charged with the responsibility of conducting public hearings on H.R. 3173 (the Act of August 4, 1947) evidenced that such restrictions insofar as half-bloods were concerned were unnecessary and that members of the Five Civilized Tribes in Oklahoma had become fully integrated into the white man's society (Defendants' Exhibit No. 23) which this Court finds to be absolutely true and correct.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of all the parties hereto and of the subject matter of this action, and jurisdiction to enter a full and complete decree herein adjudicating all rights of the parties hereto.

2. The Court concludes as a matter of law that it is unnecessary to an adjudication of this cause for this Court to determine whether it has or does not have jurisdiction to approve or disapprove the conveyance of December 3, 1965 from plaintiff to defendant Becko or to determine whether to grant or withhold approval of such conveyance, although the effect of granting to either party the relief sought of quieting title to the subject real property may, by implication, constitute an affirmation or re-

jection of the deed of December 3, 1965. By way of analogy, if the defendants herein were defending this quiet title action based on expiration of the applicable Oklahoma statute of limitations, this Court need not consider whether to approve or disapprove the deed but only whether or not the statute of limitations was, in fact, applicable. Viewed in this light, and in the light of the fact the plaintiff herself has invoked the equitable jurisdiction and powers of this Court, the issue of voluntary or involuntary consent to the proceedings, while being an issue in the State Court approval proceedings, is not an issue before this Court on the trial of this cause on its merits.

■ 3. The Act of August 4, 1947 is unconstitutional as applied in this case for the reason that to strictly apply the Act to this case would violate the substantive due process rights of the defendants as guaranteed by the Fifth Amendment of the United States Constitution. To apply the 1947 Act so as to permit the plaintiff to void the deed in question and recover the land and improvements thereon, will result in a violation of substantive due process for the reason that the actual operation of the means selected by Congress to achieve the purpose of the Act will not have a real and substantial relation to such purpose, and, in fact, such an operation of the means selected will thwart the intent and purpose of Congress.

■ A statute or act of Congress may be held unconstitutional as applied and therefore void and unenforceable by virtue of its actual operation, when it operates to deprive one of a protected right, despite the fact that the general validity of the act or statute "as a measure enacted in the legitimate exercise of police power is beyond question". *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Great Northern R. Co. v. Washington*, 300 U.S. 154, 57 S.Ct. 397, 81 L.Ed. 573 (1936).

■ It is well established that the Fifth Amendment guarantee of due process of law conditions the exercise of legislative power by insuring "that the end shall be accomplished by methods consistent with

due process". *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1933). Further, the Fifth Amendment guarantee of due process of law requires that an act or statute "shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." *Nebbia v. New York, supra.*

■ The object and purpose of the acts and statutes regarding restrictions on alienation of Indian lands owned by members of the Five Civilized Tribes and the approval required thereby, is to place the Indian on an equal footing with non-Indians in the sense of business acumen and to insure that transactions concerning their restricted lands be conducted at arm's length. *Cotcha v. Ferguson*, 165 Okl. 295, 25 P.2d 767 (1933); *Critchlow, et al. v. Bacon*, 142 Okl. 168, 285 P. 968 (1930). The logical corollary to this purpose, however, is that the acts are not for the purpose of providing the Indian with a means of asserting a fraudulent, inequitable and stale claim and retreating from a business transaction entered into by other parties in good faith, long after valuable improvements have been placed on the property. That is, the acts are intended as a shield for the Indian, to protect against overreaching and incompetency, and not as a sword for the purpose of permitting an Indian covered thereby to perpetrate a fraud.

■ It is of utmost importance for this Court to ascertain the purpose of the Act of August 4, 1947. It is the conclusion of this Court that the primary purpose of the Act of August 4, 1947 was to clarify, cure and stabilize Indian land titles in Northeast Oklahoma. Further, by placing the restrictions set forth in the Act of August 4, 1947, Congress also had as its purpose to again insure that the Indians of the Five Civilized Tribes covered by said Act would be placed on an equal footing with others in business transactions, and to insure that such Indians' transactions in regard to the restricted lands would be at arm's length and that there would not be overreaching. In interpreting statutes and acts, it is the duty of

the court to "construe the language so as to give effect to the intent of Congress." *United States v. American Trucking Associations*, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). Further, in construing the statutes, the Court should take into consideration the "purpose, the subject matter, the context, the legislative history and executive interpretation" of the act or statute. *United States v. Cooper Corporation*, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1940). The words used by Congress in a statute or act are persuasive evidence of the purpose of such an act or statute; that when the meaning of such words lead to absurd results, the courts will look beyond the words to the purpose behind the act or statute. *United States v. American Trucking Associations, supra.* Further, the act or statute "cannot be divorced from the circumstances existing at the time it was passed, and from the evil which Congress sought to correct and prevent". *United States v. American Trucking Associations, supra.*

An examination of the Act of August 4, 1947 reveals that the means selected by Congress to achieve the above stated purposes is to invalidate deeds and conveyances covered by the Act, if such deeds and conveyances are not approved by the County Court of the appropriate county in Oklahoma. However, to apply the means selected in the instant case, and allow the plaintiff to void the deed and recover the subject property and the improvements thereon, would result in a violation of substantive due process of law for the reason that such an application would not have a real and substantial relation to the purposes and objects sought to be achieved by Congress in the 1947 Act. To apply the Act, such that the deed will be invalid, will not serve Congress' purpose of clarifying, curing and stabilizing Indian land titles in Northeastern Oklahoma. Further, such an application of the means selected would not further the Congressional purpose of protecting the plaintiff, as an Indian covered by said Act, from overreaching, and of insuring that the plaintiff was on an equal footing with the defendant Becko in the sale of the subject property on December 3, 1965 and that said

sale was at arm's length and without overreaching, as the evidence shows that those purposes were, in fact, achieved in this case. The plaintiff is, and was at the time of entering into the various options leading up to the sale of the subject property, and the subsequent conveyance thereof to the defendant Becko, a competent individual, fully able to transact business on her own behalf. There was no evidence presented at trial that there was any undue influence, fraud, menace or duress practiced on the plaintiff during the course of the sales transaction with the defendant Becko. The consideration received by the plaintiff in the sale of the subject property to the defendant Becko on December 3, 1965, considerably exceeded the fair market value of the subject property on said date, and therefore, was a more than adequate and fair consideration. Further, the sale and conveyance of the plaintiff to the defendant Becko of the subject property was an arm's length transaction as evidenced by the fact that the plaintiff was represented by her experienced legal counsel, advised by tax counsel, and further, consulted the Bureau of Indian Affairs in regard to the tax aspects of the sale. By virtue of the foregoing, this Court concludes as a matter of law, that the plaintiff was not overreached in the course of her sale of the subject property to the defendant Becko.

In light of the purpose of the Act of August 4, 1947, and further, in light of the means selected by Congress to achieve that purpose, it is the conclusion of this Court that an application of the means to the facts in this case would result in such an application not having a real and substantial relation to the object and purposes sought to be achieved by Congress. Applying the means selected by Congress in this case will not achieve the Congressional purpose, and further, such an application would, in fact, thwart the Congressional purpose and would violate the traditional concepts of fundamental fairness and justice.

The Act of August 4, 1947, at most in this case, creates a rebuttable presump-

tion that the Indian grantor covered thereby was incompetent, that the consideration received was unfair, and that said Indian was overreached. This presumption has been rebutted by the overwhelming evidence in this case. The plaintiff is and was at the time of entering into the various options leading to the sale of the subject property, and the subsequent conveyance thereof to the defendant H. Harold Becko, a competent individual, fully able to transact business on her own behalf. The consideration received by the plaintiff from the defendant Becko in regard to the sale of the subject property on December 3, 1965 was considerably in excess of the fair market value of the property at that time. The sale and conveyance by the plaintiff to the defendant Becko of the subject property was an arm's length transaction, and the plaintiff was not overreached nor was she under any undue influence, duress, menace or fraud in the course of her sale of the subject property to the defendant Becko.

4. This Court concludes that the Act of Congress of August 4, 1947 is unconstitutional as applied in this case for the reason that the Act, as applied, violates due process of law as guaranteed by the Fifth Amendment of the United States Constitution by virtue of the fact that the Act is vague and uncertain in its application and, further, that there exists a lack of notice of the Act. An act or statute violates due process of law if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . ." *Cramp v. Board of Public Instruction,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *Connally v. General Constr. Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1925). Further, an act or statute valid on its face may be unconstitutional as applied. *Boddie v. Connecticut, supra; Great Northern R. Co. v. Washington, supra.*

■ The vagueness, uncertainty and indefiniteness of the Act of August 4, 1947 as applied in this case is first of all shown by reason of the fact that the Act creates an anomalous situation of requiring an individual utilizing the Act to refer to the prior Acts of Congress which created the confusion and uncertainty that the 1947 Act was intended to cure. The public hearings before the Subcommittee on Indian Affairs of the Committee on Public Lands of the House of Representatives reveals that one of the purposes of the Act of August 4, 1947 was to cure and clarify the confusion as to Indian land titles in Oklahoma created by prior acts of Congress. In order to determine whether the 1947 Act is applicable in a given situation, it must be determined whether the land was restricted in the hands of the Indian from whom the Indian heir or devisee acquired same. (Act of August 4, 1947, 61 Stat. 732). To so determine the restricted status of the Indian ancestor, one would be placed in the awkward position of having to refer to the very Acts which created the confusion sought to be cured by the 1947 Act, although the 1947 Act itself makes no reference as to how such determination is to be made. The Court concludes that this anomaly and omission renders the Act as attempted to be applied in this case so indefinite and uncertain as to be violative of due process of law under the Fifth Amendment of the United States Constitution.

The Act of August 4, 1947 is further vague and uncertain as to its application in this case for the reason that in determining whether an Indian heir or devisee vested with title to the property is subject to restrictions under the Act, the degree of Indian blood of the heir or devisee must be determined, and under the provisions of the Act, this cannot, in many situations, be ascertained. Section 2 of the 1947 Act sets forth the procedure for determining the degree of Indian blood for the purposes of the Act. (Act of August 4, 1947, 61 Stat. 732) Under Section 2 of the Act, if the Indian heir or devisee is enrolled, then there would be little problem in determining the quantum of Indian blood. However, if the Indian heir or devisee is unenrolled (the rolls of the Five Civilized Tribes were finalized and closed in 1906), the degree of Indian blood must be computed from the near-

est enrolled paternal and maternal lineal ancestors of the Indian heir or devisee. It is in this latter situation that the determination of the degree of Indian blood becomes, in many cases, unworkable. The Act, in most situations, cannot be followed when dealing with second generation heirs or devisees, all of whom would be unenrolled. That is, after an inheritance from a first generation unenrolled heir, the degree of blood of the heir or devisee cannot be determined from the final rolls. That is, the title examiner must seek information as to the degree of blood of the Indian heir or devisee from sources outside of the rolls, and in many situations this information is unavailable. Information as to the degree of blood of the original allottee-ancestor's spouse would not appear in an abstract of title covering the allottee's land. The abstract of title covering the allottee's allotment would only contain instruments and documents pertaining to the allottee. Thus, probate decrees and the like in regard to the original allottee-ancestor's spouse would not appear in the abstract of title covering land from the allottee's allotment.

Further, it is the interpretation of the Office of the Solicitor of the Department of Interior that in determining the degree of Indian blood of the heir or devisee under the 1947 Act, the Act requires only that the degree of blood be from an Indian from the Five Civilized Tribes. That is, any quantum of Indian blood from a tribe *other* than the Five Civilized Tribes is irrelevant to the determination of the degree of Indian blood under the 1947 Act. This again creates an anomalous situation for the reason that under this interpretation there could be a situation where the heir's or devisee's father was a three-quarter ($\frac{3}{4}$) blood Creek and the mother a full-blood Apache Indian, and the heir or devisee would not be subject to the Act for the reason that said heir or devisee would only have a three-eighths ($\frac{3}{8}$) degree of Indian blood from the Five Civilized Tribes. Thus, an heir or devisee whose total quantum of Indian blood is seven-eighths ($\frac{7}{8}$) and who might possibly need the protection of the Act for the reason of incompetency, would not be afforded the protection of the Act.

Further compounding the uncertainty created by the difficulties in determining the degree of Indian blood for the purposes of determining the applicability of the Act, is the fact that the Act does not state where the final rolls of the Five Civilized Tribes are maintained or can be found. As stated above, in order to determine the degree of Indian blood under Section 2 of the 1947 Act, reference must be made to the final rolls of the Five Civilized Tribes regardless of whether the heir or devisee is enrolled or unenrolled. Without knowing where the rolls are maintained, it is difficult to see how the determination of the quantum of Indian blood can be accomplished.

The Court therefore concludes that the inability to determine with certainty the degree of Indian blood under the provisions of the 1947 Act, for the purpose of determining the Act's applicability, renders the Act so vague and uncertain in its application in this case as to be violative of due process of law under the Fifth Amendment of the United States Constitution.

5. The Court further concludes that the due process of law rights of the defendant as guaranteed by the Fifth Amendment of the United States Constitution were violated in the application to this case for the reason that Congress did not provide any reasonable means by which the defendants or their attorneys could have acquired notice or knowledge of the existence or content of the Act. The Act of August 4, 1947 was never codified in the United States Code. (TR. 400) The text of the Act does not appear in the United States Code, and only "a mention of it" appears in a footnote in the United States Code. (TR. 400) Further, the Act does not appear in United States Code Annotated. (TR. 400) Single publication of the passage of the Act by separate Houses of Congress in the U. S. Congressional Record in 1947 is not a reasonable means of communication to the general public (of which the defendants are a part) of continuing existence and

content of this Act in the year 1965 when the defendant Becko purchased the subject property from the plaintiff. In fact, the Solicitor for the Department of Interior, Harold Shultz, evidences in his testimony the fact that many attorneys in Oklahoma learn of the existence of the Act from conversations with his office. The only notice of the Act of August 4, 1947 available to attorneys or members of the general public would be the mention of the Act in a footnote in United States Code, Semple, Oklahoma Indian Land Titles Ann., or by inquiry of the Solicitor's Office of the Department of Interior or if by chance a member of the general public or his attorney had access to one of the special treatises dealing with Indian land law, none of which is reasonable notice to defendants or the general public of the existence and content of this special legislation. There is no evidence in the record that the defendants had actual notice or knowledge of this Act or its contents prior to the filing of this action. It is well established that one of the primary elements of due process is that of notice. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Anderson National Bank v. Luckett,* 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1943). Therefore, by virtue of the lack of notice of the existence or content of the Act, it is the conclusion of this Court that the defendants' rights of due process of law as guaranteed by the Fifth Amendment of the United States Constitution would be violated if the Act were applied to divest them of their title to the subject real property under these facts and circumstances. It is no answer to say that everyone is presumed to know the law when the law in question is not contained in any official publication where laws of the enacting legislative body are normally found.

6. At the very least as to two-thirds of the interest which the plaintiff formerly held in the subject property, the due process of law rights of defendants guaranteed by the Fifth Amendment of the United States Constitution would be violated if the Act were applied by the cancellation of the deed of December 3, 1965 by plaintiff to defendant Becko because of lack of notice to the defendant Becko of the Act's applicability to such two-thirds interest. The Act of August 4, 1947 only places restrictions on those lands acquired by inheritance or devise from persons in whose hands the land was restricted at the time of such inheritance or devise. (Act of August 4, 1947, 61 Stat. 732)

In the instant case, the plaintiff acquired only a one-third interest in the subject property by actual inheritance, the remaining two-thirds of her interest in the subject property being acquired by her by means of a Quit-Claim Deed from her two brothers and their respective spouses in whose hands the land was not restricted at the time of the Quit-Claim Deed. Such Quit-Claim Deed recited it was given for One Dollar ($1.00) and other good and valuable consideration. (Defendants' Exhibit No. 10) Although there was testimony at the trial of this case that the Quit-Claim Deed to plaintiff from her brothers was the result of a voluntary partition of the 120-acre surplus allotment of Billy Atkins accomplished by exchange of Quit-Claim Deeds, the two Quit-Claim Deeds given by plaintiff in exchange for the Quit-Claim Deed to the 40-acre tract of which the subject property is a part would not and do not appear in the chain of record title to the subject property. As a matter of evidence in this case, only the Quit-Claim Deed to the plaintiff covering the 40-acre tract of which the subject property is a part appeared in the abstract of title furnished by plaintiff to defendant Becko for examination. The Quit-Claim Deed received by plaintiff from her two brothers and their respective spouses covering said 40-acre tract makes absolutely no reference to partition or exchange of deeds but, in fact, recites that the same was given for One Dollar ($1.00) and other good and valuable considerations. Naturally, a judicially conducted partition of this surplus allotment would have appeared in the chain of title to the subject real property, but this was a voluntary, and not a judicial partition. There was no evidence introduced

that any of the defendants or their predecessors in title to the subject property had any actual notice of the exchange of deeds or voluntary partition of the 120-acre tract. Because the abstract was totally devoid of notice of whether the plaintiff acquired two-thirds of her interest in the subject property by inheritance or devise, there was a total lack of notice of a crucial factor which is determinative of the Act's applicability. It is well established that one of the primary elements of due process is that of notice. *Mullane v. Central Hanover Bank & Trust Co., supra; Anderson National Bank v. Luckett, supra.*

 7. The nature of an action is determined by the pleadings. To confer equitable jurisdiction on the Court, the relief sought in the pleadings must be equitable in character. 27 Am.Jur.2d *Equity* § 7, pg. 525. This suit is an action of equitable cognizance, the plaintiff and the defendants each in their respective pleadings having invoked the equitable powers and jurisdiction of this Court to quiet title to real property. The plaintiff also seeks to invoke the equitable powers and jurisdiction of this Court to invalidate and cancel of record a deed of conveyance given by her under date of December 3, 1965 to the defendant H. Harold Becko and further, for the cancellation of all instruments in the chain of title to the subject property given by the defendant Becko and his successors in title to the subject property. It is well established that an action to quiet title is one of equitable cognizance. *King v. Oakley,* 434 P.2d 868 (Okl.1967); *Keith v. Lawson,* 195 Okl. 157, 155 P.2d 716 (1944). An action to cancel instruments of conveyance is also an action of equitable cognizance. *Clovis v. Clovis,* 460 P.2d 878 (Okl.1969). Thus, because the relief being sought herein by both the plaintiff and the defendants is of an equitable nature, it is concluded that this is an action in equity and as such, the rights of the parties hereto are governed by the established rules pertaining to suits in equity or of equitable cognizance. *Keith v. Lawson, supra.*

This action being in equity, this Court has broad power to accord such relief as is required by justice and equity, and as is required "to protect and conserve the equities of the parties litigant." 27 Am.Jur.2d *Equity* § 103, pgs. 624–625. In an equitable action, a court has great flexibility and if the case requires the court to furnish an equitable remedy, the courts will provide one although the question presented is novel. 27 Am.Jur.2d *Equity* § 103, pg. 625. Further, once the equitable jurisdiction of a court has been invoked, the court will decide all issues which are relevant to the case, and the court is empowered to "award relief which is complete and finally disposes of the litigation so as to accomplish full justice between the parties litigant . . ." 27 Am.Jur.2d *Equity* § 108, pgs. 629–630.

 The plaintiff in this action has invoked the equitable jurisdiction of this Court seeking the benefits of equitable relief but at the same time contending that, unlike other citizens of the United States, equitable defenses may not be asserted against her nor rules of established equity jurisprudence applied to her detriment because she is of one-half (½) Indian blood. This contention is without merit. The plaintiff is a member of the Five Civilized Tribes. Members of the Five Civilized Tribes are treated substantially different in law than members of other tribes of Indians; they are governed by completely different and special legislation and are not governed by the Indian General Allotment Act, 25 U.S.C.A. § 331, et seq. (Semple, Oklahoma Indian Land Titles, Ann., § 730, pg. 517, Thomas Law Book Company; TR. 116), and, accordingly, and as stated by the Field Solicitor testifying herein, cases dealing with Indians governed by the Indian General Allotment Act are distinguishable from cases concerning members of the Five Civilized Tribes because, in the former, a completely different set of laws would be construed. (TR. 116) Members of the Five Civilized Tribes, by treaty and by Congressional enactment, have been given the right and do hold fee title to their lands, while Indians governed by the Indian General Allotment Act are only vested with equita-

ble title in their land with the legal title remaining in the United States, i.e., the lands are trust lands. (Semple, Oklahoma Indian Land Titles Ann., §§ 55, 728; TR. 116) The plaintiff is not a restricted Indian for the reason that there is no such thing as a restricted Indian among the members of the Five Civilized Tribes. (TR. 103) Unlike Indians governed by the Indian General Allotment Act, the plaintiff is not a ward of the United States Government or any agency thereof, nor does she suffer from any incompetency or other legal disability which would shield her from the assertion of equitable defenses or application of rules of established equity jurisprudence. There is no act of Congress making members of the Five Civilized Tribes of one-half (½) blood wards of the United States Government or monies received by such Indians subject to management or control of the Bureau of Indian Affairs or the Department of the Interior or any other federal agency. Accordingly, this Court concludes as a matter of law that the plaintiff is subject to equitable defenses and the application of established rules of equity.

■ 8. By legislative enactment, Congress, in 1926, made the Oklahoma statutes of limitation applicable to all Indians of the Five Civilized Tribes and against the heirs and grantees of such Indians. (Act of April 12, 1926, § 2, 44 Stat. 240). In making the Oklahoma statutes of limitations applicable to members of the Five Civilized Tribes, it was Congress' intent to effectuate the same result as if the action had been brought by a non-Indian. *Wolfe v. Phillips,* 172 F.2d 481 (10th Cir. 1949). The underlying purpose of statutes of limitation is to prevent the unexpected enforcement of stale claims against those who have been misled by the lack of prosecution for a considerable period of time and, further, to promote diligence of prosecution. *Seitz v. Jones,* 370 P.2d 300 (Okl.1962). Congress, in enacting the 1926 Act regarding the statutes of limitation and the Five Civilized Tribes, has shown its intent to impose an obligation upon members of the Five Civilized Tribes, to diligently pursue their legal remedies and rights, and to prevent the inequities which

result from the assertion of stale claims by such Indians.

■ Like statutes of limitation, the equitable doctrine of laches also has as its purpose the discouragement of stale claims and the encouragement of diligence in prosecution. *Swartz v. Dennis,* 208 Okl. 334, 255 P.2d 923 (1953); 30A C.J.S. *Equity* § 113, pg. 31. So close are the purposes sought to be accomplished by both the statutes of limitation and laches that courts of equity, which are not usually bound by statutes of limitation, will apply the statutes by analogy in equitable actions for the purposes of determining the applicability of laches. *Shell v. Strong,* 151 F.2d 909 (10th Cir. 1945). In light of the fact that the purposes of statutes of limitation and the equitable doctrine of laches are the same, it is concluded that the purpose of Congress in its 1926 Act to bar stale claims of the members of the Five Civilized Tribes can only be fully effectuated if the equitable doctrine of laches is likewise applicable.

■ It is further concluded that cases holding that the doctrine of laches is not available in actions brought by Indians with respect to their restricted lands, are not dispositive in this case, for the reason that such cases either are concerned with Indians governed by the Indian General Allotment Act, 25 U.S.C.A. § 330 et seq., and not Indians of the Five Civilized Tribes, or such cases were decided prior to the enactment of the Act of April 12, 1926. As to the cases decided prior to the enactment of the Act of April 12, 1926, the courts at that time did not have before them the Congressional intent reflected by the 1926 Act to impose an obligation on the members of the Five Civilized Tribes to diligently prosecute their legal rights and remedies concerning their restricted lands. Further, this Court does not feel that it is compelled to follow the Oklahoma Supreme Court case of *Smith v. Williams,* 78 Okl. 297, 190 P. 555 (1920), as authority that equitable remedies are not available against Indians with respect to their restricted land. It is the conclusion of this Court that the Congressional intent

reflected by the 1926 Act to require the members of the Five Civilized Tribes to diligently prosecute their legal rights and remedies concerning their restricted lands is such as to question the validity of the rule of that case insofar as the question of equitable defenses is concerned. It is this Court's conclusion that if the Oklahoma Supreme Court were confronted with the question of the applicability of laches and other equitable defenses in actions involving Indians of the Five Civilized Tribes, the Oklahoma Court, in light of the 1926 Act, would no longer adhere to the ruling of that case insofar as laches and other equitable defenses are concerned. Federal courts, when placed in the position of applying state law, are not necessarily bound "to follow state court decisions where it appears that a state court considering the identical issue would not rely on such precedent". *Hood v. Dun & Bradstreet, Inc.,* 486 F.2d 25 (5th Cir. 1973); Compare: *Bernhardt v. Polygraphic Company of America,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956); (See concurring opinion of Justice Frankfurter, 350 U.S. at 208–212, 76 S.Ct. 273) cf. Wright, Law of Federal Courts, § 58, pgs. 238–239 (2d. Ed. 1970, West Publishing Co.).

The Court accordingly concludes that the equitable doctrine of laches may be asserted by the defendants as a defense in this case.

9. The application of the doctrine of laches depends upon the circumstances and equities of the particular case. *O'Brien v. Wheelock,* 184 U.S. 450, 22 S.Ct. 354, 46 L.Ed. 636 (1901); *Bechler v. Kaye,* 222 F.2d 216 (10th Cir. 1955). The issue of laches and the determination of whether the same is applicable, is within the sound discretion of the Court. 30A C.J.S. *Equity* § 115 pgs. 30–40.

To constitute laches, there must exist two basic elements: inexcusable delay in instituting suit; and prejudice or injury to the defendant as a result of inexcusable delay. *Alexander v. Phillips Petroleum Co.,* 130 F.2d 593 (10th Cir. 1942). There is no set or fixed time in regard to the determination of the doctrine of laches, and the

length of delay must be determined from the circumstances of each case. 30A C.J.S. *Equity* § 116 pg. 46; *Bechler v. Kaye, supra; Alsop v. Riker,* 155 U.S. 448, 15 S.Ct. 162, 39 L.Ed. 218 (1894). The basic premise of the doctrine of laches is that it is applicable in cases where, by virtue of a lapse of time, it would be inequitable for a party to enforce his legal right, when such lapse of time has resulted in prejudice to the defendant. *Socony Mobile Oil Company v. Continental Oil Company,* 335 F.2d 438 (10th Cir. 1964). One of the primary elements in determining whether the delay is inexcusable, is whether the person against whom the doctrine is being asserted had knowledge of the facts which give rise to his or her cause of action. 27 Am.Jur.2d *Equity,* § 166 pg. 709. Regarding the plaintiff's knowledge of the facts giving rise to his or her cause of action, the plaintiff is charged with such knowledge as could have been obtained upon inquiry, if such facts are such as to put a person of ordinary intelligence on inquiry. *Johnson v. Atlantic, G. & W. I. Transit Co.,* 156 U.S. 618, 15 S.Ct. 520, 39 L.Ed. 556 (1894). If such facts are known by the plaintiff, lack of knowledge of the applicable law will not ordinarily be an excuse for delay. *Alexander v. Phillips Petroleum Co., supra.*

Applying the above stated law to the evidence presented on the trial of the merits of this case, the Court concludes that the plaintiff is guilty of laches and that the relief sought by her herein is barred thereby. The plaintiff delayed for an unreasonable period of time in asserting any claim to the subject real property (eight (8) years and approximately three (3) months) during which period the defendants in good faith and without knowledge of the plaintiff's claim and in reliance on the plaintiff's deed to the defendant Becko materially changed their position by developing the property and constructing substantial improvements thereon. Defendants have suffered considerable detriment as a result of the plaintiff's delay in asserting her claim herein. The plaintiff had actual knowledge of such development and construction of substan-

tial improvements. The plaintiff and her attorney likewise knew, or with reasonable diligence should have known, of the facts giving rise to the claim asserted herein at the time of her conveyance to the defendant Becko. Both the plaintiff and her attorney had knowledge of more than sufficient facts which would put an ordinary person on inquiry as to whether the land was restricted and as to whether the deed to defendant Becko need be approved. It is the conclusion of this Court that the plaintiff's delay in asserting her claim is inexcusable under all the facts and circumstances in this case.

 10. It is a firmly established rule of equity jurisprudence that he who seeks equity must do equity, that only conscience, good faith and diligence can put equity into operation, and that he who comes into equity must come with clean hands. *Luschen v. Stanton*, 192 Okl. 454, 137 P.2d 567 (1943); 30A C.J.S. *Equity* § 113 pgs. 32–33.

 Under all of the evidence presented in the trial of this case, the Court concludes as a matter of law that the plaintiff has not sought to do equity herein and seeks to invoke the equitable aid of this Court possessed of unclean hands. Accordingly, the plaintiff may not obtain the equitable relief sought by her of quiet title and cancellation of instruments. The plaintiff's refusal to now consent to the approval of her December 3, 1965 deed to the defendant Becko is in bad faith. The plaintiff:

(1) has not sought to set aside any other conveyance by her of her restricted lands;

(2) has consented to approval of another conveyance of her restricted land to a third party not here involved after exacting payment from said third party as a condition to such consent;

(3) remained silent with regard to her claim herein while observing substantial improvements being made to the subject property by the defendants;

(4) admittedly received a fair price for the subject property, admittedly was competent during the entire transaction with defendant Becko, was admittedly advised by legal and tax counsel during the entire transaction with defendant Becko, admittedly executed, acknowledged and delivered the General Warranty Deed of December 3, 1965 and possession of the subject real property to defendant Becko as her free and voluntary act and deed;

(5) admittedly was not under any undue influence, fraud or duress;

(6) admittedly delayed for over eight (8) years and until shortly after completion of the improvements by defendants to assert her claim.

The Court concludes that a literal application of the Act of August 4, 1947 in this case would result in substantial and unjust enrichment of the plaintiff and under the facts and circumstances of this case would do substantial violence to the concept of "fundamental fairness" which the Supreme Court of the United States has declared to be the cornerstone of due process of law guaranteed by the Fifth Amendment to the United States Constitution.

11. The Court concludes that the defendants Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, are vested with legal and equitable title to, and are entitled to the peaceable possession of, Lots One (1), Two (2), and Three (3), Block One (1), and Lot Two (2), Block Two (2) of Maple Leaf Addition to the City of Broken Arrow, Oklahoma, according to the recorded plat thereof, and that the title and possession of said real property and the improvements thereon owned by said defendants should be quieted in said defendants against all claims or demands by the plaintiff, Nellie Atkins Armstrong, her husband, Ruskin Armstrong, and those claiming, or to claim, by, through or under them or any of them. The Court further concludes that defendant Maple Leaf Apartments, Ltd. is vested with legal and equitable title to, and is entitled to peaceable possession of Lot One (1), Block Two (2) of Maple Leaf Addition to the City of Broken Arrow, Oklahoma, according to the recorded plat thereof, and

that title and possession of said real property and the improvements thereon owned by said defendant should be quieted in said defendant as against all claims or demands by the plaintiff, Nellie Atkins Armstrong, the plaintiff's husband, Ruskin Armstrong, and those claiming, or to claim, by, through or under them or any of them.[1]

12. The Court further concludes that court costs herein expended should be taxed and assessed against the plaintiff, and that the defendants, and each of them, should have and recover judgment against the plaintiff, for the amount of court costs herein expended by each of such defendants respectively.

13. The Court further concludes that the receiverships herein should be dissolved, possession of the premises redelivered by the respective receivers in accordance with Conclusion of Law No. 11 above, said receivers discharged from their duties and responsibilities, and the funds currently held by said receivers should be deposited with the Court to be hereafter distributed pursuant to further order of this Court.

## JUDGMENT

The Court, on this 2nd day of August, 1977, filed in this cause its Findings of Fact and Conclusions of Law, which are hereby incorporated herein and made a part of this Judgment. Pursuant to such Findings of Fact and Conclusions of Law:

IT IS ORDERED, ADJUDGED AND DECREED that judgment be denied the plaintiff on each count and cause of action alleged by plaintiff in her Complaint and amendments thereto and that judgment be entered herein denying to plaintiff in its entirety the relief sought by her in her Complaint and amendments thereto.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendants and cross-complainants, Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, are the owners of and vested with full and complete legal and equitable title in and to the following described real property, together with all improvements thereon and rights and appurtenances thereunto belonging, located in Tulsa County, State of Oklahoma, to-wit:

Lots One (1), Two (2) and Three (3), Block One(1), and Lot Two (2), Block Two (2), MAPLE LEAF ADDITION to the City of Broken Arrow, Tulsa County, Oklahoma, according to the recorded plat thereof,

and that said defendants and cross-complainants are entitled to the peaceable possession and quiet enjoyment of all said real property, improvements and appurtenances.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that title to the above described real property and all improvements thereon and rights and appurtenances thereunto belonging be and the same is hereby quieted and confirmed in the defendants and cross-complainants, Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, against any and all claims thereto of the plaintiff, Nellie Atkins Armstrong, and the third-party defendant herein, Ruskin Armstrong.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the plaintiff, Nellie Atkins Armstrong, and the third-party defendant, Ruskin Armstrong, and each of them, have no right, title, estate, lien, claim or interest in and to the above described real property, improvements thereon and rights and appurtenances thereunto belonging, or any part thereof, and that said plaintiff and third-party defendant, and all those claiming or to claim by, through or under them, or any of them, be and they are hereby perpetually barred

---

1. In its amended Order of February 24, 1975, relative to the issuance of a preliminary injunction in this cause, the Tenth Circuit Court of Appeals authorized and empowered this Court to adjust the equities between the parties at the trial of the cause on its merits. Under the evidence presented and issues raised at the trial on the merits of this cause, and in consideration of the above and foregoing findings of fact and conclusions of law of this Court, this Court concludes that a balancing or adjustment or the equities between the parties is not warranted and that the exercise of such power extended this Court is not necessary.

and enjoined from setting up or asserting any right, title, estate, lien, claim or interest in and to the above described real property and premises adverse to the title thereto of the defendants and cross-complainants, Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the plaintiff, Nellie Atkins Armstrong, and said third-party defendant, Ruskin Armstrong, and all those claiming or to claim by, through or under them, or any of them, be and they are each hereby perpetually barred and enjoined from interfering with the possession and quiet enjoyment of the aforesaid real property and premises by the defendants and cross-complainants, Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership, and their tenants and all other persons claiming by, through or under said defendants and cross-complainants.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant and cross-complainant, Maple Leaf Apartments, Ltd., a limited partnership, is the owner of and vested with full and complete legal and equitable title in and to the following described real property, together with all improvements thereon and rights and appurtenances thereunto belonging, located in Tulsa County, State of Oklahoma, to-wit:

Lot One (1), Block Two (2), MAPLE LEAF ADDITION to the City of Broken Arrow, Tulsa County, Oklahoma, according to the recorded plat thereof,

and that said defendant and cross-complainant is entitled to the peaceable possession and quiet enjoyment of all said real property, improvements and appurtenances.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that title to the real property last above described and all improvements thereon and rights and appurtenances thereunto belonging be and the same is hereby quieted and confirmed in the defendant and cross-complainant, Maple Leaf Apartments, Ltd., a limited partner-

ship, against any and all claims thereto of the plaintiff, Nellie Atkins Armstrong, and the third-party defendant herein, Ruskin Armstrong.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the plaintiff, Nellie Atkins Armstrong, and the third-party defendant, Ruskin Armstrong, and each of them, have no right, title, estate, lien, claim or interest in and to the real property last above described, improvements thereon and rights and appurtenances thereunto belonging, or any part thereof, and that said plaintiff and said third-party defendant, and all those claiming or to claim by, through or under them, or any of them, be and they are hereby perpetually barred and enjoined from setting up or asserting any right, title, estate, lien, claim or interest in and to the latter described real property and premises adverse to the title thereto of the defendant and cross-complainant, Maple Leaf Apartments, Ltd., a limited partnership.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the plaintiff, Nellie Atkins Armstrong, and said third-party defendant, Ruskin Armstrong, and all those claiming or to claim by, through or under them, or any of them, be and they are each hereby perpetually barred and enjoined from interfering with the possession and quiet enjoyment of the last above described real property and premises by the defendant and cross-complainant, Maple Leaf Apartments, Ltd., a limited partnership, and their tenants and all other persons claiming by, through or under said defendant and cross-complainant.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Robert L. Latch, the duly appointed trustee in possession of the following described real property situated in Tulsa County, State of Oklahoma, to-wit:

Lot Two (2), Block Two (2), MAPLE LEAF ADDITION to the City of Broken Arrow, Tulsa County, Oklahoma, according to the recorded plat thereof,

be and he is hereby directed to immediately deliver peaceable possession of the latter described real property, together with all improvements thereon and appurtenances thereunto belonging, to the defendants, Owen D. Young and Robert L. Latch, d/b/a Young & Latch Investments, a general partnership. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that said trustee in possession be and he is hereby directed to render to this Court within fifteen (15) days from the date hereof a written account of his acts as trustee reflecting all receipts and disbursements by him with respect to such trusteeship and said trustee is further ordered and directed by this Court to immediately and forthwith deposit with the Clerk of this Court all monies in his possession received by him as trustee, the same together with all monies presently held by said Clerk as a part of such trusteeship to be hereafter distributed and disbursed pursuant to further order of this Court.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Will Mattoon, the duly appointed trustee in possession of the following described real property situated in Tulsa County, State of Oklahoma, to-wit:

> Lot One (1), Block Two (2), MAPLE LEAF ADDITION to the City of Broken Arrow, Tulsa County, Oklahoma, according to the recorded plat thereof,

be and he is hereby directed to immediately deliver peaceable possession of the latter described real property, together with all improvements thereon and appurtenances thereunto belonging, to the defendant, Maple Leaf Apartments, Ltd., a limited partnership. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that said trustee in possession be and he is hereby directed to render to this Court within fifteen (15) days from the date hereof a written account of his acts as trustee reflecting all receipts and disbursements by him with respect to such trusteeship and said trustee is further ordered and directed by this Court to immediately and forthwith deposit with the Clerk of this Court all monies in his possession received by him as trustee,

the same together with all monies presently held by said Clerk as a part of the latter trusteeship to be hereafter distributed and disbursed pursuant to further order of this Court.

IT IS FINALLY ORDERED, ADJUDGED AND DECREED that the defendants and cross-complainants herein have and recover from the plaintiff judgment for all their costs herein expended.